FILED
2026 Feb-25  PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

**BARRY PAYNE, JR.,**

     **Plaintiff,**

**v.**

**BLAKE BURNS,** *et al.*,

     **Defendants.**

**Case No. 3:25-cv-776-HDM**

## MEMORANDUM OPINION

Barry Payne, Jr., is suing numerous individuals and entities over his treatment at the hands of police and the medical care he received while in the Colbert County Jail. (*See* Doc. 22). Specifically, he is suing Blake Burns, Joshua Phillips, and Cherokee, Alabama ("Cherokee") for Burns's use of excessive force during his arrest of Payne in violation of Section 1983 of the U.S. Code, pursuant to a policy and custom of Phillips and Cherokee (Count I). *Id.* at 13. He is also suing Phillips, Cherokee, QCHC, Inc. ("QCHC"), Doris Pilkington, Johnny Bates, Donald Kern, Marcus Rutland, Josh Smith, Ricky Moore, and Eric Ballentine for denial of care for a serious medical need under Section 1983 (Count II). *Id.* Finally, he is suing QCHC, Pilkington, Bates, and Kern for medical negligence. *Id.* Three of those defendants—Burns, Phillips, and Cherokee—filed the pending motion to dismiss. (*See* Doc. 33).

## BACKGROUND

Payne pleaded the following facts, accepted as true:

Payne was having an argument with his father inside their shared home, which a neighbor heard and called the police. (Doc. 22, ¶ 21-23). Defendant Burns, a police officer with the town of Cherokee, *id.*, ¶ 21, was the first officer to arrive, and he entered the house, *id.*, ¶ 25-27. Payne was standing roughly ten feet away with his father, continuing to argue with him but not threatening him. *Id.*, ¶ 28-31. Payne alleged that upon entering the home, Officer Burns told Payne to get on the ground, and when he did not, Officer Burns shot Payne with a taser, causing Payne to fall onto his side. *Id.*, ¶¶ 33-34. Payne admits that by refusing to get on the ground, he was initially resisting arrest. (Doc. 38 at 4-5). Payne was immobilized by the initial shot, but rather than handcuffing him, Burns tased Payne again. (Doc. 22, ¶¶ 36-38). According to bodycam footage, Burns told Payne to "roll over on his belly," (doc. 34-4 at 1:30), which Payne could not do because he was immobilized, (Doc. 22, ¶¶ 36-39). After the initial taser shot, Payne did not verbally or physically resist Burns. (Doc. 22 ¶ 43). After the third taser deployment, Payne verbalized that he "can't move." (Doc. 34-4 at 1:33-39). Officer Burns and another officer then handcuffed Payne. (Doc. 22 ¶ 41).

Payne was then booked into the Colbert County Jail (the "Jail"). *Id.*, ¶ 66. Shortly thereafter, at around 6:30 p.m., he started experiencing symptoms related to

rhabdomyolysis, a serious medical condition that is known to result from repeated tasing. *Id.*, ¶¶ 45, 66. By roughly 2:00 a.m., the symptoms were extreme. *Id.*, ¶ 67. Payne had severe pain, could barely move his limbs, and could not sit. *Id.* During the night, he screamed and begged for help. *Id.*, ¶ 68.

In the morning, Payne was taken by Moore, a correctional officer at the Jail, *id.*, ¶ 14, to see Pilkington, *id.*, ¶ 69, a nurse who managed the medical care at the Jail for QCHC, *id.*, ¶ 16. Pilkington immediately recognized that Payne was suffering from severe, life-threatening rhabdomyolysis and that he needed immediate treatment in a hospital, and so informed Payne. *Id.*, ¶ 70. Rather than calling 911 or otherwise taking steps to get Payne promptly to the hospital, Pilkington, pursuant to established policy and custom, referred Payne to Jail personnel to contact the Town of Cherokee to come pick Payne up and take him to the hospital. *Id.*, ¶ 72. Even if an inmate has an immediate medical need that will be exacerbated by a delay in treatment (like Payne's rhabdomyolysis), neither QCHC and its medical personnel nor the sheriff and Jail personnel will call an ambulance or otherwise make sure the inmate promptly receives the medical care required. *Id.*, ¶ 73. Instead, inmates will either be given an own-recognizance bond and released from the Jail (to walk to the hospital if they cannot get a ride) or be forced to wait on a Cherokee officer to pick the inmate up and take the inmate to the hospital. *Id.*, ¶ 74.

3

This policy and custom were established and maintained so that the sheriff could avoid responsibility for the costs of necessary emergency medical care, including ambulance and hospital charges, and not for any legitimate purpose. *Id.*, ¶¶ 77, 78. Each of the individual defendants was aware that this policy and custom created a substantial risk that inmates would suffer serious harm. *Id.*, ¶ 79.

Before making this referral, Pilkington called a QCHC physician, presumably either Defendant Bates or Kern, who confirmed that Payne needed immediate treatment in a hospital. *Id.*, ¶ 83. Pilkington then communicated to Jail personnel Payne's need for immediate treatment in a hospital. *Id.*, ¶ 84. Pursuant to established policy and practice, Pilkington and several other police officers, Jail administrators, and correctional officers (Rutland, Ballentine, Smith, and Phillips) agreed that Payne would not be taken immediately to the hospital. *Id.*, ¶ 86. Instead, Phillips, the Cherokee police chief, *id.*, ¶ 9, drove from Cherokee to take Payne to the hospital, *id.*, ¶¶ 86-87. As a result of these Defendants' failure—in keeping with QCHC's policy and custom—to call 911 or otherwise ensure that Payne was taken immediately to the hospital, he was delayed in reaching the hospital by over an hour, exacerbating his rhabdomyolysis, inflicting unnecessary suffering on Payne, and risking his life. *Id.*, ¶¶ 88-89. Due to the severity of Payne's rhabdomyolysis, he still suffers from its effects and may for the rest of his life. *Id.*, ¶ 91.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "[C]omplaints alleging discrimination . . . must meet [this] plausibility standard . . . ." *Henderson v. JP Morgan Chase Bank, N.A.*, 436 F. App'x 935, 937 (11th Cir. 2011) (internal quotation marks omitted). "Conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Wiersum v. U.S. Bank, N.A.*, 785 F.3d 483, 485 (11th Cir. 2015) (internal quotation marks omitted). Similarly, a formulaic recitation of the elements of a cause of action is inadequate. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In considering the facts, courts view the allegations in the complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). And the plaintiff must merely produce enough facts to "raise a reasonable expectation that discovery will reveal evidence" of the necessary elements. *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556). The pleading standard "requires only a plausible short and plain statement of the plaintiff's claim, not an exposition of his legal argument." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011). At this stage, the issue is "not whether [the plaintiff] will ultimately prevail . . . but whether his complaint

was sufficient to cross the federal court's threshold." *Id.* (internal quotation marks and citations omitted).

## DISCUSSION

Defendants Burns, Phillips, and Cherokee move for this court to dismiss Count I, excessive use of force, and Count II, denial of care, against them. (*See* Doc. 33). For the reasons laid out below, Defendants' motion to dismiss is due to be **DENIED** on these counts.

### I.    Consideration of Bodycam Footage and Criminal Records

In moving to dismiss, Defendants ask the court to consider Officer Burns's camera footage and Payne's criminal records. (Doc. 33). In response, Payne moves to strike Payne's criminal records as improperly considered at this stage, (doc. 38 at 5), and argues that the bodycam footage may not be considered in lieu of Payne's complaint, *id.* at 6.

In resolving a motion to dismiss, a court may consider an exhibit to the motion, including a video recording or a prior criminal conviction, if the exhibit is central to the plaintiff's claim and the authenticity of the exhibit is not challenged. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1299 (11th Cir. 2024).

The court will take notice of Payne's prior criminal conviction, albeit in a very limited way. Payne does not challenge the authenticity of the proffered criminal records but rather argues that they are not central to his claim. (Doc. 38 at 5). Under

6

*Heck v. Humphrey*, a Section 1983 damages claim that would necessarily imply the invalidity of an existing conviction is not cognizable unless the conviction has been invalidated. 512 U.S. 477 (1994). Thus, the court will consider evidence of Payne's prior criminal conviction only in determining whether granting Payne damages under Section 1983 would necessarily invalidate that conviction, and Payne's motion to strike such evidence is **DENIED**.

As to the bodycam footage, it is central to Payne's claim for excessive use of force, and its authenticity is not challenged. Thus, the video may be considered. However, only "where a video is clear and obviously contradicts the plaintiff's alleged facts[] [may the court] accept the video's depiction *instead* of the complaint's account." *Baker v. City of Madison*, 67 F.4th 1268, 1277-78 (11th Cir. 2023) (emphasis added). Defendants argue that Burns's body-cam footage clearly contradicts Payne's complaint and thus that the footage—not the complaint's recounting of events—should be considered. (Doc. 34 at 11). Defendants interpret the footage as showing Payne continuing to resist arrest until Burns tases him for the final time. (Doc. 41 at 5). They state that Payne is clearly not immobilized before the final taser deployment and that "it appears that Payne is briefly trying to stand" right before the final shot. *Id.* The court cannot find support for this interpretation in the video itself. (*See* Doc. 34-4). At best the footage is unclear—in which case it does not directly contradict Payne's complaint on this point—and at worst (for

Defendants' argument) it shows Payne lying immobile on his side, looking up at Burns. *See id.* While the timing of Burns's use of the taser in the video is slightly different than in the complaint—the complaint alleges three discrete tases, while the video appears to show two tases together with a third following a few seconds later— Defendants do not rely on this difference. (*See* Doc. 41 at 5 ("[T]his distinction is of no constitutional relevance.")).

Thus, while the court may consider the bodycam footage, it will not consider the footage in place of Payne's complaint but rather will consider both together in the light most favorable to Payne.

## II.    Count I—Excessive Use of Force

Payne sues Burns, Phillips, and Cherokee for excessive use of force in Payne's arrest. (Doc. 22 at 13).

First, Defendants rely on *Heck v. Humphrey* to argue for dismissal. (*See* Doc. 34 at 13-16); *Heck*, 512 U.S. 477. They argue that the resisting-arrest conviction makes an excessive-force claim inconsistent with the criminal judgment and thus *Heck* bars the claim. (*See* Doc. 34 at 13-16). The basis of Burns's argument is that Payne was convicted—based on the same events at issue here—of resisting arrest. *Id.* If Payne was resisting arrest, Burns contends, then his use of a taser was justified as a matter of law. *Id.* Therefore, according to Burns, Payne cannot now maintain an excessive-force claim because such a claim would require a finding that the taser

deployment was unjustified—which, in turn, would necessarily imply that Payne was not resisting arrest, contrary to his criminal conviction. *Id.*

But there is a flaw in this argument. Payne admits that he *did* resist arrest. (Doc. 38 at 4-5). He merely contends that he had *stopped* resisting arrest by the time Burns tased him for the second and third time. (Doc. 22 ¶¶ 36-43). And as Burns admits, the crux of the issue is whether it objectively appeared that Payne had ceased resisting and had become compliant when Burns tased him for the second and/or third time. (Doc. 41 at 4-5). Thus, it can be true both that Payne resisted arrest and that Burns used excessive force in arresting him. Indeed, the Eleventh Circuit has repeatedly held that excessive force claims can be maintained based on force after the plaintiff has stopped resisting or been subdued. *See Cendan v. Trujillo*, 779 Fed. App'x. 688, 689-90 (11th Cir. 2019); *Hadley v. Gutierrez*, 526 F.3d 1324, 1331 (11th Cir. 2008); *Dyer v. Lee*, 488 F.3d 876, 883 (2007); *Wells v. Cramer*, 158 Fed. App'x. 203, 204 (11th Cir. 2005). That is the case here.

### A) Burns

Burns argues that various facts make Burns's use of force reasonable, including that Burns was initially the only officer on the scene, that domestic violence calls are inherently dangerous, and that Burns was forced to make a split-second decision in choosing how much force to apply. (Doc. 34 at 8-9). Burns contends that these facts justify Burns's use of force as a matter of law. *Id.* at 7, 9.

While this may turn out to be true, a motion to dismiss is not the proper forum to decide this issue. The question at this stage is whether Payne has properly pleaded his case, not whether he will ultimately prevail on the merits. *See Skinner*, 562 U.S. at 530. Here, Payne pleaded that (1) he ceased resisting, and (2) that Burns tased him twice more. (Doc. 22 at 36-43). This is uncontradicted by the bodycam footage. Burns admits that "[t]he critical question is whether the tasings (be it two or three) occurred when it objectively appeared Payne was continuing his resistance or whether they were administered after it objectively appeared Payne had ceased resisting and had become compliant." (Doc. 38 at 4-5). Thus, Payne has properly pleaded his claim of excessive use of force.

Next, Burns argues that he is entitled to dismissal because he is protected by qualified immunity. To be eligible for qualified immunity, officials like Burns must demonstrate that they were acting in the scope of their discretionary authority. *O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004). An official need only show that the acts he undertook "are of a type that fell within the employee's job responsibilities." *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004). In the case at bar, Payne's allegations relate to actions by a police officer (Burns) while carrying out an arrest. (Doc. 22 ¶ 2). Burns's decisions and conduct arising out of these duties fall within the scope of Burns's discretionary authority.

Once it is determined that the officials acted within their discretionary authority, courts use a two-part test to determine whether qualified immunity is appropriate: first, the court determines whether there was a constitutional violation; second, the court determines whether the constitutional right in question was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Fourth Amendment's guarantee of freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest or other "seizure." *See Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *Mercado v. City of Orlando*, 407 F.3d 1152, 1156-57 (11th Cir. 2005). A claim of excessive force used during the course of a seizure is analyzed through the lens of the Fourth Amendment's "objective reasonableness" standard. *Graham*, 490 U.S. at 395-96 (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)); *McCullough v. Antolini*, 559 F.3d 1201, 1205-06 (11th Cir. 2009).

The Eleventh Circuit has considered an officer's use of a taser in multiple cases. The Eleventh Circuit's decision in *Baker v. City of Madison* is instructive. 67 F.4th 1268. The court drew a distinction between the single use of a taser to subdue an arrestee and repeated taser use on someone who is not resisting or combative, with the former being constitutional and the latter not. *Id.* at 1280-81. Payne concedes that he resisted initially, as shown on the video and as alleged in Payne's complaint, and that his resistance permitted the initial tasing. *See Draper v.*

*Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) ("Although being struck by a taser gun is an unpleasant experience, the amount of force Reynolds used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury.").

But the Eleventh Circuit has made clear that officers violate the constitution and lose the protection of qualified immunity when they gratuitously tase an individual after he has been immobilized by an initial tasing. *See Hardigree v. Lofton*, 992 F.3d 1216, 1232 (11th Cir. 2021) (denying qualified immunity for repeated use of the taser while plaintiff "was on the ground, immobilized, being arrested for a minor incident, and posed no threat"); *Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 955 (11th Cir. 2019) (denying qualified immunity for tasing "a man who, as a result of an initial shock, is lying motionless on the floor and has wet himself, and who presented only a minimal threat to begin with"); *Glasscox v. City of Argo*, 903 F.3d 1207, 1215 (11th Cir. 2018) ("In light of this clearly established law, no objectively reasonable officer in Officer Moses's position could have thought it was lawful to use a taser repeatedly on an arrestee who was not resisting, even if that arrestee had previously offered resistance and was not yet restrained."); *Boynton v. City of Tallahassee*, 650 Fed.Appx. 654, 660-61 (11th Cir. 2016) (denying qualified immunity for repeated tasing of formerly combative patient who was "barely responsive, lying immobile on the floor of the ambulance" who did not get onto

stretcher and tensed his body when officer tried to move him onto stretcher); *Wate v. Kubler*, 839 F.3d 1012, 1021 (11th Cir. 2016) ("Construing the evidence in favor of Plaintiff, the unambiguous facts are that Barnes was no longer resisting at least after the first two tasings, and that Kubler's further use of the Taser was wholly unnecessary, and grossly disproportionate to the circumstances."); *Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009) (denying qualified immunity to officer who tased an individual after he was "immobilized," "limp," and "writhing in pain").

Thus, controlling case law establishes that Payne plausibly alleged Burns's violation of the Constitution and clearly established law.

### B) Phillips and Cherokee

Since Payne does not allege Chief Phillips was present when Burns used force against Payne, the only possible claim against him is based on supervisor liability. Supervisory liability arises when there is a causal connection between the actions of a supervising official and the constitutional violation. *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 820 (11th Cir. 2017). The causal link can be established by proof (1) of a failure to respond to a widespread pattern of abuse; (2) of a custom or policy implemented by the official that resulted in deliberate indifference; or (3) that the supervisor directed his subordinates to act unlawfully or knew the subordinates would act unlawfully but failed to stop them. *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007).

Likewise, "municipal liability may be based upon . . . an action taken or policy made by an official responsible for making final policy in that area of the city's business." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994).

Putting these two concepts together, if a plaintiff plausibly alleges that a final policymaker implemented a custom or policy that resulted in deliberate indifference, the policymaker himself may be held liable through supervisory liability and the municipality may be held liable through municipal liability.

The only qualification that the Supreme Court has placed on the type of decision upon which "an unconstitutional governmental policy could be inferred," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988), is that the decision must represent "a deliberate choice to follow a course of action . . . made from among various alternatives," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). If such a decision is made by an official who has the authority to establish final policy in the particular area, then the decision will give rise to municipal liability, *id.* at 483-84, even if the decision is "tailored to a particular situation and [is] not intended to control decisions in later situations," *id.* at 481. Thus, for example, the county prosecutor's instructions to the deputy sheriffs in *Pembaur* to "go in and get" employees presumed to be inside a locked business premises, without a search warrant, were held to be acts of the county, because the county prosecutor had authority to establish final county policy regarding law enforcement practices. *Id.* at

472-73, 484-85. Similarly, in *Cooper*, the Eleventh Circuit found a police chief had final policymaking authority in law enforcement matters and held his one-time decision to enforce an unconstitutional Florida statute against a newspaper publisher was adoption of "policy" that caused a deprivation of the publisher's First Amendment rights sufficient to render the municipality liable under Section 1983. *Cooper v. Dillon*, 403 F.3d 1208, 1222 (11th Cir. 2005).

A refusal to investigate can create a custom or policy. *See, e.g.*, *Vineyard v. Cnty. of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (considering practice of not investigating excessive force complaints as evidence of custom or policy). In *Vineyard* the Eleventh Circuit observed that "a single constitutional violation may result in municipal liability when there is sufficient independent proof that the moving force of the violation was a municipal policy or custom." 990 F.2d at 1212 (internal quotation marks omitted).

Moreover, the Eleventh Circuit has made clear general allegations regarding a widespread pattern of abuse like those in Payne's complaint are sufficient to state a supervisory liability claim. *See Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016) (relying upon plaintiff's allegation of "numerous stabbings and beatings"); *Danley v. Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *as recognized in Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010) ("Unlike the plaintiffs in *Cottone*, Danley has

alleged sufficiently specific facts to establish the necessary causal connection between supervisors [Jail Administrator] Rikard and [Sheriff] Willis and the unconstitutional conduct of the jailers. Danley's complaint alleges that before this incident, Rikard and Willis had knowledge through 'force reports and similar documents, inmates complaints, jailer complaints, attorney complaints, judicial officer complaints, and personal observation' the jailers at the Lauderdale Detention Center 'regularly used pepper spray excessively as a means of punishment and not for legitimate reasons.'"); *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1237 (11th Cir. 2010) (concluding, "given the Complaint's factual detail about Harper's incident and the similar incident involving Parker just one month before, as well as the specific allegations regarding the customs or policies put in place by the supervisors, Plaintiff met both the Rule 8 and heightened pleading standards").

Likewise, the Eleventh Circuit has refused to require the plaintiff to identify other specific victims of a municipal policy to state a claim. *See Hoefling v. City of Miami*, 811 F.3d 1271 (11th Cir. 2016). The court recognized that a plaintiff's more general allegations describing the city's policies and practices regarding boat seizures, combined with the circumstances of the plaintiff's claim, were sufficient and not "the sort of 'naked allegations' [the court] found wanting in *Weiland* [*v. Palm Beach Cnty. Sheriff's Office*], 792 F.3d [1313,] 1329-30 [(11th Cir. 2015)]" and held that, "[u]nder *Leatherman*, *Twombly*, and *Iqbal*, Mr. Hoefling's allegations were

sufficient to state a facially plausible municipal liability claim because they permit 'the reasonable inference that [the City] is liable for the misconduct alleged.'" *Id.* at 1281 (citations omitted).

Here, Payne begins his complaint by alleging that "Phillips was aware of and a participant in an incident in January 2023 in which Burns tased Chris Kryston after Chris got on his knees with his hands up to submit to the arrest." (Doc. 22 ¶ 48). "Burns then ordered Chris to put his hands behind his back," and "Chris said he couldn't," so "Burns then tased Chris a second time." *Id.*, ¶¶ 50-52. "Phillips, who arrived on scene and was informed regarding Burns' actions, did not discipline Burns for the excessive force . . . ." *Id.*, ¶ 54. "To the extent Burns did not already believe he could act with impunity, Phillips' failure and refusal to discipline Burns for tasing Chris directly led Burns to believe he could tase citizens with impunity." *Id.*, ¶ 55. It was this policy and custom—which was solidified by Phillips' subsequent failure to discipline Burns for tasing Payne three times—Payne alleges, that led Burns to believe he could use his taser on Payne with impunity. *Id.*, ¶¶ 55-56.

Although this incident with Mr. Kryston is the only specific incident that Payne alleges, he alleges that "[b]eyond the Kryston and Payne incidents, Phillips was aware of a pattern and practice of Burns violating citizens' rights and using excessive force on citizens." *Id.*, ¶ 58. Specifically, "Cherokee policymakers, including Phillips, were aware of prior incidents through use of force reports (which

are approved through the chain of command), complaints from citizens, reports from officers, and through other sources." *Id.*, ¶ 32. Payne also notes that "[b]ecause use of force reports and internal investigations are not a matter of public record, the number of excessive force and other incidents sanctioned by Cherokee is not known." *Id.*, ¶ 64. With regard to all of this, Payne alleges that "Phillips acted as a final policymaker for Cherokee concerning law enforcement matters in ratifying and refusing to discipline Burns' misconduct." *Id.*, ¶ 57. This is consistent with Payne's allegation that "Defendant Joshua Phillips was the Cherokee police chief at all relevant times." *Id.*, ¶ 9.

Phillips relies on *Piazza v. Jefferson Cnty.* for the proposition that "[a] single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several [subordinates]." 923 F.3d at 957. Phillips argues that "Payne is left with a single unproven allegation of a prior excessive force incident involving William Kryston," and thus that his claim for supervisory liability fails as a matter of law under *Piazza*. (Doc. 34 at 17). This analysis is unpersuasive for two reasons.

First, the "single incident of a constitutional violation" which the *Piazza* court held was "insufficient to prove a policy or custom" was not a prior incident. *See Piazza*, 923 F.3d at 957. Rather, it was the incident in question in *Piazza*. Thus, the *Piazza* holding, when applied to the case at bar, does not mean that Payne failed to

18

prove policy or custom because he only pointed to the Kryston event as evidence. Rather, it would mean that the Payne event alone could not prove a policy or custom.

Second, Payne points to "use of force reports (which are approved through the chain of command), complaints from citizens, reports from officers, and . . . other sources" as evidence of a pattern or practice. (Doc. 22, ¶ 32), which the plaintiff in *Piazza* failed to do. This meets the standard set forth by the Eleventh Circuit. *See Lane*, 835 F.3d at 1307; *Danley*, 540 F.3d at 1315; *Harper*, 592 F.3d at 1237; *Hoefling*, 811 F.3d at 1281. To require more at the motion to dismiss stage would be to require Payne to present evidence that only Defendants have.

In summary, Payne alleges that Phillips, acting as a final policymaker, failed to discipline an officer for a factually similar use of excessive force, that beyond that incident (and the one at issue here), Phillips was aware of Burns using excessive force on citizens and failed to discipline him, and that Cherokee policymakers, including Phillips, failed to take action on prior incidents that they were aware of through use of force reports, complaints from citizens, reports from officers, and through other sources. "Whether [a plaintiff] can prove what he has alleged is not the issue. At this stage of the proceedings, we must take the complaint's factual allegations as true, and those allegations paint an ugly but plausible picture. If proven, that picture will support a finding of municipal liability," *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011), as well as a finding of supervisory liability.

19

Phillips also argues that he is entitled to qualified immunity on the issue of excessive force. (Doc. 33 at 21). The court has already established that Payne plausibly pleaded a constitutional violation. *See supra*. Thus, it must now be determined whether he violated clearly established law.

The court has already found that Payne plausibly alleged that Burns's underlying actions violated clearly established law. *See* Section II(A), *supra*. And the court found that Payne plausibly alleged supervisory liability on the part of Phillips. In so finding, the court cited *Pembaur*, 475 U.S. at 483, and *Cooper*, 403 F.3d at 1222, to establish that Phillips could be a final policymaker and thus that his actions could constitute an adoption of policy. The court cited *Vineyard*, 990 F.2d at 1212, to establish that a failure to investigate can create a custom or policy. The court cited *Lane*, 835 F.3d at 1307, *Danley*, 540 F.3d at 1315, *Harper*, 592 F.3d at 1237, and *Hoefling*, 811 F.3d at 1281, to establish that allegations of a pattern of abuse, even if not pinned to specific individual occurrences, can be sufficient to state a supervisory liability claim. This demonstrates that the law in this area is clearly established, and Phillips is not, based on these pleadings, entitled to qualified immunity.

## III.  Count II—Denial of Care

Under the Eighth Amendment's prohibition of "cruel and unusual punishments," jail personnel cannot act with deliberate indifference to the medical

needs of inmates. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). The Eleventh Circuit has applied an "identical" deliberate-indifference standard for the treatment of pretrial detainees such as Payne under the Fourteenth Amendment. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007).

To establish deliberate indifference, a plaintiff must show (1) "that [he] had a serious medical need," (2) "that the [jail] official acted with deliberate indifference to [his] serious medical need," and (3) that there is causation. *Id.* The first prong is objective, in the sense that it looks to the inmate's actual medical condition; the second is subjective, in the sense that it looks to the official's state of mind. *Id.*

"A medical need that is serious enough to satisfy the objective component is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (internal quotations omitted). Payne alleged that upon being taken to see Pilkington, Pilkington "immediately recognized that Payne was suffering from severe, life-threatening rhabdomyolysis, that he needed immediate treatment in a hospital, and so informed Payne." (Doc. 22, ¶ 70). She then "called a QCHC physician, presumably either defendant Bates or Kern, who confirmed that Payne needed immediate treatment in a hospital." *Id.*, ¶ 83. "Pilkington then communicated to jail personnel Payne's need for immediate treatment in a hospital." *Id.*, ¶ 84. These

facts, taken as true, plausibly show that Payne had a serious medical need, thus satisfying the objective prong.

Under the subjective prong, deliberate indifference requires "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Goebert*, 510 F.3d at 1327 (alteration in original) (internal quotation marks omitted).

To satisfy the first requirement, a plaintiff must plausibly allege facts showing "how [each of the] Defendants" would have had the "actual knowledge" alleged. *Harper*, 592 F.3d at 1234-35. "Each individual defendant must be judged separately and on the basis of what that person knows." *Id.* at 1234 (quoting *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008)).

To satisfy the second and third requirements, the plaintiff must plausibly allege facts showing that each defendant disregarded that risk by conduct that is more than gross negligence. *See Goebert*, 510 F.3d at 1327. In the specific context of a claim arising out of the alleged denial of medical care, conduct that is more than mere negligence includes: (1) knowledge of a serious medical need and a failure or refusal to provide care; (2) delaying treatment for non-medical reasons; (3) grossly inadequate care; (4) a decision to take an easier but less efficacious course of treatment; or (5) medical care that is so cursory as to amount to no treatment at all. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). "However, medical

treatment violates the Constitution only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Nam Dang by & through Vina Dang v. Sheriff, Seminole Cnty. Fla.*, 871 F.3d 1272, 1280 (11th Cir. 2017) (quoting *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)). The subjective elements of a deliberate indifference claim ensure that accidental inadequacy, negligent diagnosis or treatment, and even medical malpractice are not actionable under Section 1983. *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000).

Payne has satisfied this pleading standard as to Phillips. Payne pleaded that "Pilkington contacted Rutland, who in turn informed Ballentine and Smith and Phillips regarding Payne's need for immediate treatment in a hospital." (Doc. 22, ¶ 85). This plausibly pleads Phillips's subjective awareness of a substantial risk. Payne then pleads that "pursuant to established policy and practice, these defendants agreed that Payne would not be taken immediately to the hospital. Instead, an officer would drive from Cherokee to take Payne to the hospital. . . . When Phillips could not arrange for another officer to take Payne, Phillips drove from Cherokee to pick Payne up and take him to the hospital." *Id.*, ¶¶ 87-88. Payne specifically pleads that "Phillips . . . [was] aware of Payne's need for emergency medical treatment and the risks associated with delay but failed and refused to call 911 or otherwise ensure that Payne was taken immediately to the hospital." *Id.*, ¶ 88. "As a result, Payne was

delayed in reaching the hospital by over an hour, exacerbating his rhabdomyolysis, inflicting unnecessary suffering on Payne, and risking Payne's death." *Id.*, ¶ 89. This delay in treatment was due to a custom and policy that was put in place "so that the sheriff could avoid responsibility for the costs of necessary emergency medical care, including ambulance and hospital charges and not for any legitimate purpose." *Id.*, ¶ 78. These facts, accepted as true, plausibly show that Phillips disregarded the risk to Payne's health and delayed treatment for non-medical reasons, satisfying the pleading requirement for a claim of deliberate indifference.

Nonetheless, Phillips argues that he is entitled to qualified immunity as to Payne's deliberate indifference claim. Because Phillips was acting within his discretionary authority in choosing to drive Payne to the hospital himself, the court must determine whether there was a constitutional violation, then the court must determine whether the constitutional right in question was clearly established. *Saucier*, 533 U.S. at 201. The court has already found that Payne properly pleaded a constitutional violation. *See supra*. Thus, the remaining question is whether the law defining that constitutional violation was clearly established. It was.

The law is clearly established that an official cannot ignore a life-threatening medical condition or fail to address the condition. *See Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1186 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730 (2002), *as recognized in King v. Lawson*,

24

No. 21-14492, 2024 WL 3355179, at *3 (11th Cir. July 10, 2024) ("A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who deliberately ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.") (internal quotation marks omitted); *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994) ("At the time of Harris's incarceration, it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference.") (citing *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989)); *Goebert*, 510 F.3d at 1330 ("an official acts with deliberate indifference when he intentionally delays providing an inmate with access to medical treatment, knowing that the inmate has a life-threatening condition or an urgent medical condition that would be exacerbated by delay"); *Paulk v. Ford*, 826 Fed. App'x. 797, 805-06 (11th Cir. 2020) (reversing order granting summary judgment in favor of jail doctor because there was evidence from which a jury could find that the doctor disregarded a substantial risk of serious harm to inmate by only prescribing medication for symptoms and doing little or nothing to actually treat the underlying life-threatening condition causing the inmate's deteriorating state); *McElligott*, 182 F.3d at 1257 (holding that in light of inmate's repeated complaints of severe abdominal pain the defendants were deliberately indifferent by letting the inmate's condition deteriorate and doing nothing to alleviate his pain other than giving him

Tylenol, Pepto-Bismol, and anti-gas medication, which under the circumstances was "so cursory as to amount to no care at all" and represented the defendants' knowing choice to take an "easier but less efficacious course of treatment," particularly given that "[e]ven the care they did provide often came after significant delays").

Payne has also satisfied this pleading standard with regard to Cherokee. As explained *supra*, "municipal liability may be based upon . . . an action taken or policy made by an official responsible for making final policy in that area of the city's business." *Church*, 30 F.3d at 1343. Payne has properly pleaded that Phillips, as Chief of Police for Cherokee, was a final policymaker. (Doc. 22, ¶ 57); *see also Cooper*, 403 F.3d at 1222. And he has properly pleaded that Phillips's policy amounted to denial of care.

Defendants argue that Payne fails to allege prior similar incidents sufficient to establish notice to the municipality. (Doc. 41 at 13). That argument misses the theory pleaded. A plaintiff may establish municipal liability not only through a pattern of similar constitutional violations, but also through the actions or policies of a final policymaker whose decisions represent official municipal policy. *See Church*, 30 F.3d at 1343. Payne has properly pled that Phillips was the final policymaker for the Jail and that his policies regarding medical care resulted in the denial and delay of treatment. *See supra*. Thus, the absence of additional prior incidents does not foreclose municipal liability at the pleading stage. Defendants' contrary authorities

involve proof of notice through a pattern of violations, which is not the exclusive route to municipal liability. Thus, Payne has properly pleaded municipal liability for Cherokee.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, (doc. 33), is **DENIED**.

**DONE** and **ORDERED** on February 25, 2026.

**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE